IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ANNE U. MARVIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:21-cv-711 (LMB/TCB) |
| ) | |
| LLOYD J. AUSTIN III, Secretary, U.S. ) | |
| Department of Defense, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Before the Court is a Motion to Dismiss ("Motion") filed by defendant Lloyd J. Austin III in his official capacity as the Secretary of the U.S. Department of Defense ("DoD"). [Dkt. No. 30]. The Motion, which plaintiff Anne U. Marvin ("plaintiff" or "Marvin") opposes, has been fully briefed. Having found that oral argument would not assist the decisional process, the Motion will be resolved on the materials filed by the parties. For the reasons that follow, defendant's Motion will be granted in part and denied in part.

## I. BACKGROUND

### A. Factual Background

Because the motion under consideration is a Motion to Dismiss, the Court "accept[s] as true all well-pleaded facts in [the] complaint and construe[s] them in the light most favorable to the plaintiff." Lucero v. Early, 873 F.3d 466, 469 (4th Cir. 2017) (quoting Matherly v. Andrews, 859 F.3d 264, 274 (4th Cir. 2017)).

In December 2017, Anne Marvin, a contractor with SAIC, began a part-time assignment to advise Guy Roberts ("Roberts"), who was then the Assistant Secretary of Defense for Nuclear, Chemical, and Biological Defense Programs. [Dkt. No. 24] at ¶¶ 11, 30. Shortly after Marvin

started that assignment, "Roberts began kissing and hugging [Marvin] in the workplace, making suggestive comments to her, and asking her to get drinks after work." Id. at ¶ 16. His inappropriate and unwelcome conduct escalated over the subsequent months, to the point that in the spring of 2018, Marvin felt compelled to move to a desk further from Roberts's office "to try to avoid [him]." Id. at ¶¶ 18-25. Her new desk was in the Nuclear Matters office, one of the three offices that reported directly to Roberts. Id. at ¶ 30. In April 2018, the head of that office, Deputy Assistant Secretary of Defense for Nuclear Matters Peter Fanta ("Fanta"), told Marvin that he had "observed Roberts repeatedly hugging, kissing, and touching Marvin and another woman in the office" and "suggested to Marvin that he report Roberts's conduct." Id. at ¶ 26. Marvin "insisted that she could handle the situation herself for the time being." Id.

Nonetheless, Roberts continued to harass Marvin. Id. at ¶ 28. By July 2018, Marvin "had determined that her work environment under Roberts was so intolerable that" she had no choice but to resign; however, Fanta not only persuaded Marvin to stay in the department, he also "worked with management" to have her reassigned in August 2018 from Roberts's office to his own, the Nuclear Matters office. Id. at ¶ 30. By October 2018, Marvin was advising and reporting directly to Fanta full time through a contract with a different contractor, ANSER, a non-profit that offers professional advisory services to the DoD. Id. at ¶¶ 31, 33. At this point, Roberts's "attitude toward[s Marvin] changed drastically." Id. at ¶ 32. Although he had approved Marvin's reassignment, Roberts began acting coldly and "even rude[ly]" towards Marvin. Id.

It was also in the October and November 2018 time period that complaints started being made about Marvin. First, in October 2018, the Contracting Officer's Representative requested copies of her deliverables, which Marvin alleges was unusual and only occurred if someone "had

2

raised concerns about the work product." Id. at ¶ 37. Then, starting in November 2018 and continuing into early 2019, Roberts, "with and through his staff," including Chris Grisafe ("Grisafe") and Drew Walter ("Walter"), who were Roberts's advisors, made multiple complaints about Marvin's work performance to various entities. Id. at ¶¶ 38-39. Notably, on December 21, 2018, "Roberts directed one of his subordinates" to make an anonymous report[1] to the DoD Inspector General ("IG") that Marvin was performing "inherently governmental functions" and engaging in "other contract improprieties, including performing personal services for Fanta." Id. at ¶ 43.

Meanwhile, Roberts became the subject of formal complaints as well. In December 2018, a female employee reported to the Office of the Under Secretary of Defense for Acquisition and Sustainment—the office to which Roberts answered[2]—that Roberts sexually harassed her. Id. at ¶ 42. The Office of the Under Secretary of Defense for Acquisition and Sustainment consisted of at least three members relevant here: Ellen Lord ("Lord"), the Under Secretary of Defense for Acquisition and Sustainment; Karen Saunders ("Saunders"), the Chief of Staff to Ellen Lord; and Alan Shaffer ("Shaffer"), the Deputy Under Secretary for Acquisition and Sustainment. Id. at ¶¶ 41, 49. In response to the complaint, Saunders held several meetings to address the issue. Id. at ¶¶ 41, 44. Saunders met with Fanta and the two other Deputy

---

[1] The complaint does not reveal how plaintiff became aware of the authors of the "anonymous" complaint.

[2] Although the complaint does not describe the relevant organizational hierarchy, it is a matter of public record. OUSD A&S Organizations, Office of the Under Secretary of Defense, https://www.acq.osd.mil/organizations.html (last visited January 10, 2022). Consequently, the Court may take judicial notice that Roberts, as Assistant Secretary of Defense for Nuclear, Chemical, and Biological Defense Programs, reported to the Office of the Under Secretary of Defense for Acquisition of Sustainment. Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Doing so does not convert this Motion to a summary judgment motion. See id.

3

Assistant Secretaries of Defense ("DASDs") who reported to Roberts; then, Saunders met with Fanta, the two other DASDs, and Roberts. Id. at ¶¶ 44-45.

Marvin "voiced her concerns" about Roberts to Saunders on January 31, 2019, the day after she learned that Roberts had orchestrated the December 2018 anonymous complaint about her. Id. at ¶ 46-47. In her conversation with Saunders, Marvin told Saunders that "Roberts had sexually harassed her and was now retaliating against her...." Id. at ¶ 47. After Saunders told Marvin to put her complaint in writing, Marvin provided a seven-page memorandum on February 3, 2019, detailing Roberts's sexual harassment and retaliatory actions. Id. at ¶ 48. Saunders shared the memorandum with Lord and Shaffer. Id. at ¶ 49. Lord, in turn, referred the matter to the IG. Id. at ¶ 50.

That same month, the IG informed Roberts and Fanta that it was formally investigating the December 2018 anonymous complaint about whether Fanta assigned Marvin to perform "inherently governmental functions, unauthorized personal services, or work that was outside the scope of a Government contract." Id. at ¶¶ 51, 53. Marvin told Lord that Roberts had initiated the December 2018 complaint to retaliate against her. Id. at ¶ 54. Lord told Marvin that she was in contact with the IG and keeping "close tabs" on its investigation of Roberts. Id. During this time period, Shaffer met with Marvin to discuss her complaints about Roberts. Id. On February 27, 2019, Marvin directly informed the IG that she was concerned Roberts was retaliating against her, claiming that Walter—one of Roberts's subordinates—had told her that she "would probably be fired" because of the investigation. Id. at ¶¶ 56-57.

In March 2019, Marvin provided Saunders a draft of a letter that Roberts appeared to have written in late 2018. Id. at ¶ 60. The letter, which ended with Roberts's signature block, contained a list of allegations about Marvin, including that she was "performing inherently

4

governmental work supervising Government employees" and "engag[ing] in an inappropriate relationship" with Fanta. Id. at ¶ 58. It ended with an instruction: "List yourself (Mr. Grisafe) or the appropriate person to be the point of contact." Id. at ¶ 59 (emphasis omitted). Consequently, Marvin assumed Roberts had intended for Grisafe to "[c]omplete [the letter] and submit [it] to the . . . IG." Id. at ¶ 58.

On March 7, 2019, the IG interviewed Marvin about her complaints against Roberts as well as the anonymous complaint about her contractual misconduct. Id. at ¶ 61. On April 2, 2019, Roberts resigned. Id. at 62.

On May 21, 2019, the IG received an anonymous complaint alleging that Fanta had "empowered" Marvin to create a "toxic" work environment in which she directed profanity at employees and that Fanta was engaged in an inappropriate relationship with Marvin. Id. at ¶¶ 64, 74. The IG did not inform Fanta that it was investigating this complaint until August 8, 2019. Id. at ¶ 70. As soon as he became aware of the IG investigation, Fanta "counsel[ed]" Marvin for her use of profanity. Id. at ¶ 74. A few days later, Fanta told the rest of the Nuclear Matters staff—who "used profanity regularly"—that profanity would no longer be tolerated. Id. at ¶¶ 74, 77.

In May 2019, shortly after Roberts resigned, Fanta requested that Shaffer designate Marvin as a detailee under the Intergovernmental Personnel Act ("IPA"), which would give Marvin "many of the rights and privileges of a federal employee" and moot the contract issues the IG was investigating. Id. at ¶¶ 66-67. As of August 2019, Shaffer had not granted that request. Id. at ¶¶ 68-69. When Fanta resubmitted the request, Shaffer's assistant said that Shaffer wanted to wait until the IG investigation was finished. Id. at ¶ 69. Fanta submitted the request for a third time in October 2019. Id. at ¶ 78. In September or October 2019, Fanta also

5

asked Shaffer whether the Nuclear Matters office could advertise for an open GS-15 position, one for which Marvin alleges she would have competed and been a very strong candidate. Id. at ¶¶ 79, 81-83. Although Shaffer initially agreed to Fanta's request, he ultimately "did not approve posting the position for competition." Id. at ¶¶ 79-80.

On October 15, 2019, the IG notified Fanta that it had concluded its investigation and could not substantiate the allegations that Fanta used Marvin to perform inherently governmental functions, that Fanta created a "toxic" work environment, or that Fanta engaged in an inappropriate relationship with Marvin. Id. at ¶ 84. On the other hand, the IG did find that Marvin had used profanity in the workplace, but it determined that her conduct did not create a hostile work environment. Id. On October 18, 2019, Fanta notified Shaffer of the results and suggested that the allegation regarding Marvin's use of profanity was a form of "sexism." Id. at ¶ 85. He then requested for a fourth time that Shaffer grant Marvin the status of an IPA detailee. Id. at ¶ 86. Although Shaffer's assistant told Fanta that Shaffer was busy with a budgeting process and would sign the paperwork after November 7, 2019, Shaffer never completed the paperwork. Id. at ¶ 87.

On December 10, 2019, the IG publicly released the results of its investigation into Roberts's conduct. Id. at ¶ 88. The report found that Roberts "had sexually harassed and created a hostile work environment for three women employees, including Marvin." Id. In addition, it found that Marvin's allegations of retaliation "did not warrant further investigation," because the December 2018 and May 2019 anonymous complaints had focused on Fanta, not Marvin, and therefore the IG "investigation that ensued was based on allegations exclusively against . . . [Fanta], not [Marvin]." Id. at ¶ 90 (alterations in original).

After the IG released its findings, Lord, Shaffer, and Saunders decided to have Marvin removed from the contract. Id. at ¶ 93. Marvin was not notified of this decision until January 2, 2020, when her contractor, ANSER, told her that defendant had removed her from her position. Id. at ¶ 95. Although she was not given any reasons for her termination that day, she later learned that Shaffer said she was fired for having had an inappropriate relationship with Fanta, using profanity, and having "too much power." Id. at ¶¶ 98-100. Shaffer fired Fanta on the same day as plaintiff was terminated from the contract, and then assigned Walter to Fanta's position as Deputy Assistant Secretary of Defense for Nuclear Matters. Id. at ¶¶ 94, 96. The complaint editorializes that this assignment was made "despite Walter's lack of experience and qualifications." Id. at ¶ 96. Shaffer and Walter then hired Adam Trull, a male with less experience than Marvin, into a GS-15 position in the Nuclear Matters office—a position similar to that which Fanta requested be advertised for competition. Id. at ¶¶ 101-104. At an unknown date, when Marvin sought a new position with the U.S. Department of the Air Force, "[o]fficials working for Walter" told the Air Force contracting representative that Marvin was "mean" and "convinced" the representative to reject her as a candidate. Id. at ¶ 110. Marvin went another several months without being placed on a new contract and ultimately resigned from ANSER. Id. at ¶ 111.

### B. Procedural History

On January 16, 2020—about two weeks after she was terminated from the contract—Marvin initiated her first contact with defendant's Equal Employment Opportunity ("EEO") counselors, alleging claims of sex discrimination, sexual harassment, and reprisal. Id. at ¶ 6. The agency completed its investigation on September 17, 2020, and Marvin filed a formal EEO complaint on February 24, 2021. Id. at ¶¶ 7-8. She alleges without providing any further details that she has exhausted her administrative remedies. Id. at ¶ 9.

7

On June 11, 2021, Marvin filed a three-count complaint in this court, alleging that defendant discriminated against her because of her sex, created a work environment that was hostile to her because of her sex, and retaliated against her for resisting and reporting Roberts's unwelcomed advances, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. [Dkt. No. 1]. After defendant responded to the complaint with a motion to dismiss [Dkt. No. 18], plaintiff filed an amended complaint (the "complaint"), which added a fourth count alleging that defendant created a work environment that was hostile to her because she engaged in protected activity (i.e., a retaliation-based hostile work environment) in violation of Title VII. [Dkt. No. 24].

## II. DISCUSSION

In the pending Motion to Dismiss, brought under Fed. R. Civ. P. 12(b)(6), defendant argues that all but two of plaintiffs' claims are untimely, and the two timely claims fail to state a claim upon which relief can be granted. For the reasons described below, the Court will grant defendant's Motion as to all but plaintiff's claim for retaliation based on her removal from the ANSER contract, which is part of Count IV.

### A. **Standard of Review**

Under Rule 12(b)(6), the Court must dismiss the complaint if "plaintiff's allegations fail to state a claim upon which relief can be granted." Abdelhamid v. Sec'y of the Navy, 525 F. Supp. 3d 671, 681 (E.D. Va. 2021) (quoting Adams v. NaphCare, Inc., 244 F. Supp. 3d 546, 548 (E.D. Va. 2017)). To survive a 12(b)(6) motion, plaintiff's factual allegations must be more than speculative and must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In a Title VII case specifically, "'an employment discrimination plaintiff need not plead a prima facie case of discrimination' to survive a motion to dismiss." Bing v. Brivo Sys., LLC, 959 F.3d 605, 616 (4th Cir. 2020) (quoting Swierkiewicz

8

v. Sorema N.A., 534 U.S. 506, 515 (2002)). "Instead, a Title VII plaintiff is 'required to allege facts to satisfy the elements of a cause of action created by that statute.'" Id. (quoting McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015)). Although the Court must accept all well-pleaded allegations as true and view the complaint in the light most favorable to the plaintiff, it need not accept "unwarranted inferences, unreasonable conclusions, or arguments." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (quoting Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 616 n.26 (4th Cir. 2009)).

"Untimeliness" claims are addressed within the context of a 12(b)(6) motion, not a 12(b)(1) motion as plaintiff implies in her brief. Edwards v. Murphy-Brown, L.L.C., 760 F. Supp. 2d 607, 614 (E.D. Va. 2011). A federal employee must "initiate contact" with an EEO counselor "within 45 days" of the date of the alleged incident.[3] 29 C.F.R. § 1614.105(a). Here, it is undisputed that plaintiff did not "initiate contact" with an EEO counselor until January 16, 2020. Accordingly, for a claim to be timely, the action on which it is based must have occurred on or after December 2, 2019.

## B. Analysis

The complaint asserts four causes of action: sex discrimination (Count I), a sex-based hostile work environment (Count II), a retaliation-based hostile work environment (Count III), and retaliation (Count IV). Each is addressed in turn.

### 1. Count I

Under 42 U.S.C. § 2000e-16(a), "[a]ll personnel actions affecting employees . . . in executive agencies," such as the Department of Defense, "shall be made free from any

---

[3] Defendant does not argue that plaintiff is not an "employee" for Title VII purposes because she is a contractor. Accordingly, there is no dispute that plaintiff must comply with the 45-day time limit.

discrimination based on race, color, religion, sex, or national origin." Count I alleges that defendant violated this provision by (1) "denying her IPA [detailee] status," (2) "denying her the opportunity to compete for a GS-15 position in the Nuclear Matters office for which she was qualified," and (3) "directing her removal from the ANSER contract," because of her sex. [Dkt. No. 24] at ¶ 118.

Neither of the first two bases are timely. As for the first basis, Shaffer never explicitly denied Marvin IPA detailee status; he simply did not act on any of Fanta's four requests for it. Although this inaction makes it conceptually difficult to determine when an affirmative "denial" occurred, the latest relevant allegation in the complaint is that Shaffer's assistant said the paperwork would be signed after November 7, 2019, but Shaffer did not sign it. As for the denial of the GS-15 position, the complaint does not allege when Shaffer "did not approve posting the [GS-15] position for competition." It only alleges that he initially agreed to advertise the position in "September or October 2019," but at some unspecified point "did not approve the posting for competition." As a result, the Court is left to speculate as to whether Shaffer denied the posting after December 2, 2019, which is an insufficient basis to sustain a complaint at this stage. See Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").

Plaintiff attempts to remedy these defects by arguing that the two denials "occurred" when she first learned of them, which she alleges was January 2, 2020, the day she was removed from the ANSER contract. Although the Fourth Circuit has rejected the discovery rule in the Title VII context, it has not rendered notice entirely irrelevant to the question of timeliness. Hamilton v. 1st Source Bank, 928 F.2d 86, 88 (4th Cir. 1990); Young v. Barnhart, 52 F. App'x 191, 193 n.4 (4th Cir. 2002). "To the extent that notice enters the [timeliness] analysis, it is

10

notice of the employer's actions, not the notice of a discriminatory effect or motivation, that establishes the commencement of the pertinent filing period." Hamilton, 928 F.2d at 88. Even so, plaintiff's argument is unpersuasive, because the complaint does not allege that she was unaware that Shaffer denied her IPA detailee status or the opportunity to compete for a GS-15 position until January 2, 2020. Moreover, because plaintiff first raised this allegation in a brief opposing defendant's Motion, the Court cannot consider it. See E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc., 637 F.3d 435, 449 (4th Cir. 2011) ("[S]tatements by counsel that raise new facts constitute matters beyond the pleadings and cannot be considered on a Rule 12(b)(6) motion.").

The only timely basis for Count I is Marvin's removal from the ANSER contract, which defendant concedes; however, plaintiff fails to plausibly state a claim of sex discrimination on this basis. The complaint alleges that Lord, Shaffer, and Saunders were collectively motivated by plaintiff's gender when they decided to remove her from the contract. Absent any direct evidence of such motivation, plaintiff must at least allege that by being removed, she was treated differently from similarly situated employees outside her protected class. Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). That the complaint fails to do, because Shaffer also fired Fanta—a similarly situated man—the same day Marvin was removed from the contract. The complaint alleges that Shaffer said that he, Lord, and Saunders removed Marvin because she had an inappropriate relationship with Fanta, used profanity to create a hostile work environment, and had "too much power" in her job responsibilities. Although plaintiff argues that these were impermissible sex-based reasons, the same reasons applied equally to Fanta. The anonymous complaints described by plaintiff in her complaint alleged that Fanta "was engaged in an inappropriate relationship to Marvin," that Fanta "empowered Marvin to create a 'toxic'

11

work environment in which she directed profanity at employees," and that "Fanta assigned Marvin to perform 'inherently governmental functions, unauthorized personal services, or work that was outside the scope of a Government contract." The complaint does not allege that Fanta was fired for any other reason. Consequently, the only reasonable inference is that Marvin and Fanta were fired on the same day for the same reasons. Given these facts which plaintiff has included in her complaint, she has not plausibly alleged that she was removed from the contract because of her sex. Accordingly, Count I will be dismissed.

### 2. Counts II & III

In Counts II and III, plaintiff alleges two types of a hostile work environment. Count II alleges that defendant created a work environment that was hostile to plaintiff because of plaintiff's sex, whereas Count III alleges that defendant created a work environment that was hostile to plaintiff because plaintiff engaged in protected activity. Both counts allege a continuing violation based on defendant (1) scrutinizing plaintiff's job duties; (2) making false allegations to the IG that she was working outside the scope of her contract, having an inappropriate relationship with Fanta, and creating a hostile work environment by using profanity; (3) denying her IPA detailee status; (4) denying her the opportunity to compete for a GS-15 position; (5) directing her removal from the ANSER contract; and (6) interfering with her ability to obtain other employment. [Dkt. No. 24] at ¶¶ 132, 142.

"[E]ven if most of the harassing conduct on which a plaintiff relies to establish her hostile work environment claim occurred outside the statutory period, the claim will be considered timely if at least one act continuing the violation occurred within the statutory period." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 227 (4th Cir. 2016). Consequently, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory

time period." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 120 (2002). The only two timely discrete acts are plaintiffs' removal from the ANSER contract and Walter's alleged interference with plaintiff's ability to obtain other employment; however, the latter cannot contribute to a hostile work environment claim because it occurred after Marvin left the workplace. See Dawson v. Delta Air Lines, Inc., No. 1:18-cv-240, 2018 WL 5316004, at *5 (E.D. Va. Oct. 26, 2018) ("[I]t is unclear how a hostile work environment can occur for an employee who is on long-term leave from the workplace."). The Court must therefore determine whether the acts preceding plaintiff's removal from the ANSER contract were "adequately linked" to her removal, such that they were part of the same actionable hostile work environment. Mustafa v. Iancu, 313 F. Supp. 3d 684, 693-94 (E.D. Va. 2002). Incidents are "adequately linked" when they "involve[ ] the same type of employment actions, occur[ ] relatively frequently, and [are] perpetrated by the same managers." Id. at 93 (alterations in original) (quoting Morgan, 536 U.S. at 120-21).

Defendant argues that Counts II and III do not demonstrate one continuing hostile work environment because they involve different employment actions allegedly committed by five different managers over roughly fifteen months. For example, defendant argues that Roberts and his subordinates submitting false accusations to the IG between October 2018 and May 2019 is entirely distinct conduct from Shaffer's decisions not to grant plaintiff IPA detailee status or the opportunity to compete for a GS-15 position between May 2019 and January 2020. Plaintiff responds that these acts are connected because "[t]here is no gap in time between Roberts'[s] and his subordinates' harassment of plaintiff through the . . . IG process and Shaffer's withholding jobs from plaintiff," and that Shaffer, Lord, and Saunders relied on the accusations spread by

13

Roberts and his subordinates to carry out their decisions, thereby perpetuating a hostile work environment.

Plaintiff's arguments are unavailing. To start, the untimely incidents are distinct from each other. The actions of Roberts and his subordinates between October 2018 and May 2019 involved different managers and a different type of conduct than the actions (or inactions) of Shaffer after May 2019. The former involved unfounded personal attacks on Marvin's character carried out by one group, whereas the latter involved the denial of certain employment status and publication of a job opening by an unrelated person. Plaintiff cannot bridge this gap by simply arguing that when the former ended, the latter began, because the complaint does not allege any connection between Shaffer and Roberts. Without any connection, there are not enough allegations to permit the inference that Shaffer picked up where Roberts left off.

Moreover, the actions of Roberts and his subordinates between October 2018 and May 2019 are not adequately linked to plaintiff's removal from the contract in January 2020. There is no overlap among the managers who made the decision to remove Marvin from the contract and the employees who scrutinized her work and submitted false accusations to the IG. Moreover, these actions occurred more than six months apart. See Mustafa, 313 F. Supp. 3d at 694 (holding that incidents were not adequately linked where they occurred roughly five months apart and were perpetrated by different managers). To supply a connection, plaintiff argues in her brief that Lord, Saunders, and Shaffer removed Marvin "[w]ith Walter's input," but the complaint never alleges that Walter was involved in that decision. The Court therefore will not consider that alleged fact. See E.I. du Pont de Nemours & Co., 637 F.3d at 449. Plaintiff also attempts to create a connection by arguing that Lord, Saunders, and Shaffer relied on Roberts's allegedly false accusations to remove Marvin from the contract. That argument does not save her hostile

14

work environment claim, because the termination decision and Roberts's allegedly false accusations still involved different managers taking different actions more than six months apart.

In contrast, Shaffer's decisions to deny Marvin IPA detailee status and the opportunity to compete for a GS-15 position are adequately linked to her removal. Shaffer was involved in all three decisions, all three decisions occurred between May 2019 and January 2020, and all three decisions involved the same type of employment conduct—that is, denying Marvin employment opportunities, whether it be a promotion or simply maintaining her position. Nonetheless, these decisions cannot be the basis for a hostile workplace claim because plaintiff maintains that she did not become aware of them until after she left the workplace. This contention arises in the context of plaintiff arguing that her discrete claims are timely. Specifically, in her opposition to defendant's timeliness argument, plaintiff claims that she "only understood that Shaffer would not assign her to a position through the IPA on January 2, 2020," and that she "had no reason to believe Shaffer was withholding the vacancy announcement to prevent her from competing" until after she was removed from the contract and when defendant hired Trull. These arguments defeat the merits of Counts II and III, because plaintiff's unawareness of Shaffer's conduct between May 2019 and January 2, 2020 is inconsistent with a claim that his inaction caused her to experience a hostile work environment during that time. See Perkins v. Int'l Paper Co., 936 F.3d 196, 211 (4th Cir. 2019) ("[I]nformation about which a plaintiff is unaware cannot, by definition, be part of a plaintiff's work experience. Thus, such information is not proper for consideration in evaluating the severe or pervasive requirement of a hostile work environment claim."). Accordingly, Counts II and III fail to state a claim upon which relief can be granted and will be dismissed.

15

3. Count IV

Count IV alleges that defendant violated § 2000e-16 by retaliating against her for reporting Roberts and Walter to the IG and participating in the IG's investigation of Roberts's misconduct. [Dkt. No. 24] at ¶ 149. Specifically, Count IV alleges that defendant (1) falsely alleged to the IG that she was working outside the scope of her contract, engaged in an inappropriate relationship with Fanta, and created a hostile work environment by using profanity in the workplace; (2) denied Fanta's request to convert her status to an IPA detailee; (3) denied her the opportunity to compete for a GS-15 position; (4) removed her from the ANSER contract; and (5) interfered with her ability to obtain other employment. Id. at ¶ 152. As previously discussed, most of these claims are untimely. The complaint does not allege that Marvin was denied either IPA detailee status or the opportunity to compete for a GS-15 position within the 45 days preceding her January 16, 2020, EEO complaint. See supra Section II.B.1. And the allegedly false complaints to the IG occurred in December 2018 and May 2019. In contrast, and as defendant concedes, Marvin's removal from the ANSER contract and Walter's alleged interference with her ability to obtain employment with the Air Force are timely.[4] Accordingly, the Court must assess whether plaintiff has plausibly alleged a retaliation claim based on these two actions. To do so, plaintiff must plausibly allege that (1) she engaged in a protected activity, (2) defendant took a "materially adverse action" against her, and (3) there is a causal link between the protected activity and materially adverse action. See Boue v. Mattis, No. 1:17-cv-

---

[4] It is unclear whether plaintiff has presented Walter's alleged interference to the EEO. The Court cannot check for itself because the administrative record has not been produced. And it is an open question because the alleged interference occurred after plaintiff first contacted an EEO counselor with a retaliation claim. Nonetheless, defendant has forfeited any such objection by failing to raise it. See Fort Bend Cnty v. Davis, 139 S. Ct. 1843, 1846 (2019) (holding that Title VII's charge-filing requirement is not jurisdictional and therefore can be forfeited if not timely raised).

505, 2018 WL 1863643, at *8 (E.D. Va. Apr. 17, 2018); Caldwell v. Johnson, 289 F. App'x 579, 592 (4th Cir. 2008). When viewed in the light most favorable to the plaintiff, the complaint alleges sufficient facts to make this showing with regard to her removal from the ANSER contract.

As to the first element, defendant does not dispute that plaintiff engaged in protected activity, and the Court sees no reason to find otherwise at this stage. See Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998) (stating that "protected activities" include not just participating in Title VII investigations and proceedings but also opposing discriminatory practices by "utilizing informal grievance procedures" and "voicing one's opinions"). Plaintiff's complaint to the IG about Roberts would satisfy this element.

As to the second element, defendant concedes that plaintiff's removal from the ANSER contract qualifies as materially adverse action but contests the sufficiency of Walter's alleged interference with her future employment opportunities. A "materially adverse action" is one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). In Burlington Northern, the Supreme Court held that in the context of a non-federal employee, the materially adverse action need not be tethered to the workplace because "[t]he scope of [Title VII's] antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 67. Defendant argues that Burlington Northern's "materially adverse" standard should be limited to non-federal employees, whereas federal employees like plaintiff need to allege an adverse "personnel action." Defendant's argument is unconvincing. Although the Fourth Circuit has yet to hold in a published decision that Burlington Northern's "materially adverse" standard

17

applies to federal employees, it has applied the Burlington Northern standard in two unpublished decisions. See Caldwell, 289 F. App'x at 592; Pueschel v. Peters, 340 F. App'x 858, 861 (4th Cir. 2009). In addition, a court in this district has recently found that "[g]iven the Fourth Circuit's unpublished decisions in Pueschel and Caldwell, and taking into account every other circuit decision on this issue, it is apparent that the Fourth Circuit, if given the opportunity to do so in a published decision, would apply Burlington Northern's 'materially adverse' standard rather than the 'adverse employment action' standard to a federal employee's Title VII retaliation claim." Boue, 2018 WL 1863643, at *8 n.21. Accordingly, the Court will apply Burlington Northern's "materially adverse" standard, which Walter's alleged interference would satisfy. If an employee knew that her employer would "convince" a prospective employer not to hire her if she were to make or support a charge of discrimination, it would be reasonable to expect that she would be dissuaded from making that charge in the first place. As a result, the second element is satisfied as to this second retaliation claim.

  The causal element is the closest call. As to the removal claim, the allegation that Lord, Saunders, and Shaffer, who were the decision-makers, acted with retaliatory animus is weak given that Lord and Saunders actively investigated plaintiff's claims about Roberts's sexual harassment and assisted her with reporting them to the IG; however, Lord and Saunders nonetheless are alleged to have agreed to plaintiff's removal from the contract. Moreover, as plaintiff argues, Lord and Saunders's past supportive actions do not preclude them from acting with retaliatory animus later, and plaintiff has alleged facts suggesting that Shaffer may not have been favorably inclined towards her. Without the benefit of discovery, the Court has no explanation as to why plaintiff was terminated from the contract. The only explanation for plaintiff's removal that is provided in the complaint came from Shaffer, who parroted the same

allegations that Roberts and his subordinates fed to the IG and which the IG found were unsubstantiated, including that plaintiff had an inappropriate relationship with Fanta. Given this allegation, as well as the allegations about Shaffer's conduct throughout 2019, there are sufficient facts pleaded in the complaint to allow plaintiff's retaliatory removal claim to survive.

As to the second retaliation claim, the complaint does not allege sufficient facts to make out a plausible claim. Plaintiff has not actually alleged that Walter interfered with her attempt to obtain work with the Air Force because of her protected activity. Rather, the complaint merely speculates that unnamed "[o]fficials working for Walter" retaliated against her, without specifically alleging that Walter directed those officials to provide the negative job reference. As a result, it is unclear why these unnamed officials would have a motive to retaliate against plaintiff. Adding to the imprecision of this claim is the complaint's failure to identify the date or at least the time frame for the alleged bad reference. The Court cannot speculate when it occurred, and the longer the time between a plaintiff's protected activity and the adverse action, the less plausible a retaliation claim becomes. See Emami v. Bolden, 241 F. Supp. 3d 673, 681 (E.D. Va. 2017); Adkins v. Fairfax Cnty. School Bd., No. 1:08-cv-91, 2008 WL 2076654, at *6 (E.D. Va. 2008). Moreover, the claim would be implausible even if the complaint alleged that Walter orchestrated the negative job reference. Walter may have harbored resentment towards plaintiff, given that she reported him to the IG in February 2019, and given his alleged closeness to Roberts, whom Marvin also reported to the IG; however, the complaint does not allege that Walter did anything to plaintiff between February 2019 and January 2020, which undercuts any inference that Walter's actions after January 2020 were retaliatory. See Emami, 241 F. Supp. 3d at 681 (stating that acts three to four months apart are too attenuated); Adkins, 2008 WL 2076654, at *6 (dismissing a retaliation claim where plaintiff relied solely on temporal proximity

19

to show a causal nexus and two to five months lapsed between the protected activity and adverse action). Because plaintiff's allegations concerning an alleged negative reference being retaliatory are purely speculative, this ground for her retaliation claim will be dismissed. See Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").

## III. CONCLUSION

For the reasons stated above, defendant's Motion will be granted in part and denied in part by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 10th day of March, 2022.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge